# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. 2:22-mj-152
2377 Mt. Olive Rd., Bidwell, OH 45614, including )
curtilage, detached buildings, vehicles, and cell phones )
located therein or on Michael Valentine )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

2377 Mount Olive Road, Bidwell, Ohio 45614, including curtilage, detached buildings, vehicles, and cell phones located therein or on Michael Valentine, which is further described in Attachment A. See Attachment A.

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of controlled substances |
| 21 U.S.C. § 846 | Conspiracy to distribute controlled substances |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

E. Travis Aaron S.A. FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: 3/7/2022

*Judge's signature*

City and state: Columbus, Ohio       CHELSEY M. VASCURA, U.S. MAGISTRATE JUDGE
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) | Case No. 2:22-mj-152 |
| the residence located at 2377 Mt. Olive Rd, | ) | |
| Bidwell, OH 45614, including any curtilage, | ) | |
| detached buildings, vehicles, and | ) | |
| cellular phones located therein or on Michael | ) | |
| Valentine | ) | Magistrate Judge |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, E. Travis Aaron, Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state as follows:

### EDUCATION TRAINING AND EXPERIENCE

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Resident Agency in Portsmouth, Ohio. I have been so employed since 2018. Prior to joining the FBI, I worked as a law enforcement officer in varying capacities. I began my law enforcement career in 2012 as a patrol officer in Coulterville, Illinois, where I spent three years working on all case work assigned to my jurisdiction. I transferred to the Red Bud, Illinois Police Department in 2015 where I continued as a patrol officer for the city. I helped create an educational program for narcotics that was presented to the local school district along with certification as an Active Shooter Instructor by 4E. I transferred to Southern Illinois University-Edwardsville (SIUE) in 2016 as a patrol officer. I was promoted to a Field Training Officer for the department prior to leaving to accept a position as Special Agent for the FBI in 2018.

2. As a federal agent, I am authorized to investigate violations of laws of the United States and have the authority to execute warrants issued under the authority of the United States. As part of my daily duties as an FBI agent, I investigate criminal violations into criminal enterprises, narcotics investigations, organized crime, and violent crimes to include the unlawful possession, possession with the intent to distribute, and actual distribution of controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I have also participated in the execution of federal search warrants and federal arrest warrants in relation to these investigations. Additionally, I have been involved with the

analysis of pen registers and monitoring Title III intercepts related to narcotics investigations.

## PURPOSE OF THE AFFIDAVIT

3. The facts set forth below are based upon my own personal observations, investigative reports, and information provided to me by other law enforcement agents. I have not included in this affidavit all information known by me relating to the investigation. I have set forth only the facts necessary to establish probable cause for a search warrant for Michael D. Valentine's (hereinafter Valentine) residence located at 2377 Mt. Olive Rd, Bidwell, Ohio 45614 (the SUBJECT PREMISES). I have not withheld any evidence or information that would negate probable cause.

4. The SUBJECT PREMISES to be searched is more particularly described in Attachment A and, for the items specified in Attachment B, which constitute instrumentalities, fruits, and evidence of violations of Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846 and Distribution of Controlled Substances, in violation of 21 U.S.C. § 841(a)(1). I am requesting authority to search the entire SUBJECT PREMISES, including the residential dwelling, curtilage, detached buildings, vehicles thereon that Michael Valentine owns or has access to and more specifically described herein, and any cellular telephone devices located therein or on Michael Valentine, wherein the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## APPLICABLE STATUTES

5. Title 21, United States Code, Section 846, makes it a federal crime for any person to attempt or conspire to commit any offense defined within the subsection, which in the case of this investigation is Title 21, United States Code, Section 841(a)(1), making it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## BACKGROUND REGARDING ACTIVITIES OF DRUG TRAFFICKERS

6. Your Affiant has communicated with other law enforcement officers and agents to gain familiarity with the ways in which narcotics traffickers conduct their business, including methods of distributing narcotics, the use of cellular telephones, and the use of vehicles to facilitate their illegal activities. Your affiant's training and experience as an FBI Special Agent, as well as your affiant's conversations with Special Agents of the Drug Enforcement Agency

2

(DEA) and local investigators familiar with narcotics trafficking, form the basis of the opinions and conclusions set forth below. Based on your Affiant's training, experience, and the experience of other officers, detectives, and agents, your Affiant is aware:

a. that narcotics traffickers often place assets in names other than their own and/or use fictitious identification to avoid detection of these assets by government agencies or local law enforcement;

b. that even though these assets are in other persons' names the narcotics traffickers continue to exercise dominion and control;

c. that narcotics traffickers must maintain and finance their ongoing narcotics activities, as well as for paying bills, acquiring assets, and making other purchases;

d. that it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, bus tickets, rental car receipts, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, purchasing, processing, storage, sale and distribution of drugs, and the collection of its proceeds. That the aforementioned books, records, receipts, notes, ledgers, etc, are maintained where the narcotics traffickers have ready access to them;

e. that it is common for narcotics traffickers to secrete contraband, proceeds of drug sales, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value; and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money made from engaging in narcotics trafficking activities in secure locations within their residences and/or other locations over which they maintain dominion and control, in order to have ready access to them;

f. that it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotic proceeds, such as: currency, financial instruments, precious metals and gem stones, jewelry, books, records, invoices, receipts records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, loan records, money orders, bank drafts, cashier checks, bank checks, wire transfers, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences and/or other locations which they maintain dominion and control;

g. that when drug traffickers amass a large amount of proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits;

h. that to accomplish these goals, narcotics traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, Western Union

3

and other wire transfer or Money Service Businesses sales agents, check cashing services, real estate agents, securities brokers, accountants, attorneys, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

i. that narcotics traffickers often utilize electronic equipment such as currency counting machines, telephone answering machines, telephone caller identification boxes, and cellular telephones in their drug activities;

j. that drug traffickers often take or cause to be taken photographs/video tapes of themselves, their associates, their property, and their products. These traffickers usually maintain these photographs/video tapes in their residences and/or other locations in which they maintain dominion or control, including on electronic devices which are used to post such photographs/videos on social media or other websites or applications;

k. that the sale of controlled dangerous substances, generates large quantities of United States currency (aka, street money);

l. that is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

m. that the Currency Transaction Report (CTR - IRS Form 4789), which is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

n. that in order to evade the filing of a Currency Transaction Report (CTR), narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency:

o. that narcotics traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their suppliers, customers, and other associates involved in their narcotics trafficking organization;

p. that drug traffickers commonly have in their possession, that is on their person, at their residences and/or other locations over which they maintain dominion and control, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency;

4

  q. that courts have recognized unexplained wealth is probative evidence of crimes, in particular, trafficking in narcotics; and

  r. that individuals involved in illicit drugs often require the use of cellular telephones to set up the times, places, and manner for collecting proceeds, and often use cellular telephones to conduct or facilitate their future illicit drug operations.

### CELL PHONES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

7. Based on my knowledge, training, and experience, I know that a "cellular telephone" or "cell phone" means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving videos; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may include geographic information indicating where the cell phone was at particular time. Cell phones can store information for long periods of time. Similarly, things that have been viewed via the Internet on cell phones are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

8. I know from my training and experience that cellular telephones may be important to criminal investigations in two distinct ways: (1) the cellular phones themselves may be evidence, instrumentalities, or fruits of crime, and/or (2) cellular phones may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. The cellular phone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular phone is also likely to be a storage medium for evidence of crime. A cellular phone used to commit a crime of this type may contain: data that is evidence of how and when the cellular phone was used; data that was sent or received to or from another cellular phone user; and other records that indicate the nature of the

offense. Rule 41 of the Federal Rules of Criminal Procedure permits the government to seize and search cellular telephones that are evidence of a crime, contraband, and instrumentalities and/or fruits of crime.

9. This application seeks permission to seize and locate not only electronically stored information on cellular phones that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the cellular phones were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on any cellular phones seized because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cellular telephone device is evidence may depend on other information stored on the phone and the application of knowledge about how it behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

10. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the seizure and examination of any cellular phones seized consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

### INVESTIGATION AND PROBABLE CAUSE

11. In January of 2022, law enforcement identified a government source who had previously been provided suspected fentanyl by an individual identified by the government source as Michael Valentine. The government source had previously received an ounce of suspected fentanyl from Valentine and arranged to repay the amount of $2400 to Valentine upon their next scheduled meeting.

12. On or about January 24, 2022, law enforcement made a video-recorded, controlled, purchase of a white powdery substance sold as fentanyl from Valentine. Prior to the purchase of suspected fentanyl from Valentine, law enforcement applied a GPS tracker to the source's vehicle with his/her consent. The government source was issued a covert recording device and US Currency, which had been previously recorded by law enforcement. The government source and his/her vehicle was searched for contraband, which yielded negative results. The government source contacted Valentine by calling (740) 339-2592 and arranging to meet for a narcotic purchase. Based on AT&T records, I know that this phone number is associated with a cellular telephone. Upon arrival at the agreed-upon location, the government source provided Valentine with $2400 of pre-recorded cash for the previous exchange of suspected fentanyl. Valentine arranged to "front" (common street slang for receiving drugs with the intention of repaying the value of the drugs at a later date) the government source with an additional ounce of fentanyl for a repayment of $2400 at a later date.

13. On or about January 24, 2022, aerial surveillance began after the government source made telephone contact with Valentine. Aerial surveillance observed the government source drive his/her vehicle directly to the pre-arranged meeting location to meet with Valentine. Valentine was observed to be located at a rural driveway, associated with 43 Scenic Road, Vinton, Ohio, more specifically GPS Coordinates 38.95065N, 82.3422W. This location is approximately 1 mile from Valentine's residence, 2377 Mount Olive, Road, Bidwell, Ohio

45631. In 2019, law enforcement executed multiple search warrants at 2377 Mount Olive, Road, Bidwell, Ohio, 45631, during which law enforcement confirmed that Valentine was residing at the address. Aerial surveillance observed the government source's vehicle park behind a Chevrolet Tahoe. Law enforcement conducted drive-by surveillance and positively identified Valentine sitting in the driver's side of the Chevrolet Tahoe. Aerial surveillance observed the government source exit his/her vehicle and enter the rear passenger side of the Chevrolet Tahoe. The government source then exited the rear passenger side of the Chevrolet Tahoe and approached his/her vehicle. The government source then returned back to the driver's side of the Chevrolet Tahoe. Upon the government source returning back to his/her vehicle, Valentine exited the driver's side of the Chevrolet Tahoe, stood at the rear of the Tahoe, and then re-entered the driver's side of the Tahoe as the government source left the area. Aerial surveillance observed Valentine wait several minutes until the government source was out of sight and then Valentine continued to drive up a steep hill, to the end of the driveway, specifically to GPS Coordinates 38.95154N, 82.32603W. At the end of the driveway, Valentine exited the vehicle, walked around to the passenger door, opened the door, and retrieved small items, unable to be identified from aerial surveillance. Valentine then walked to a covered structure and reached toward the outside rafters of the structure. Valentine entered the structure, which contained what appeared to be kennels, fences, and dogs contained inside the fences.

14. Valentine proceeded to enter and exit his vehicle several times during the aerial surveillance after initialing exiting the vehicle. Valentine also entered the kennel structure and fences several times. It is unknown what Valentine was doing inside the structure. Valentine also walked to the rear side of the kennel structure where numerous dogs were observed attached to chains that were secured to the ground. Numerous apparent doghouses could be observed within the wooded area behind the structure. Aerial surveillance continued to observe Valentine's activities at the dog kennel location for approximately forty minutes. Aerial surveillance then observed Valentine enter the Chevrolet Tahoe, proceed down the driveway, and travel to his residence, 2377 Mount Olive Road, Ohio 45631. Valentine exited the Chevrolet Tahoe and entered the residence through the garage attached to the residence.

15. Upon leaving the Scenic Drive location, mobile units maintained surveillance of the government source until they met at a predetermined location. The government source provided law enforcement one ounce of suspected fentanyl and the recording device that had

been previously issued by law enforcement. The government source advised that he/she was to repay $2400 in exchange for the one ounce of fentanyl he/she received during the meet with Valentine. Law enforcement discovered the suspected fentanyl weighed approximately 29.5 grams in its original packaging and also yielded a positive indication for the presence of fentanyl when field tested.

16. Your Affiant reviewed Ohio Law Enforcement Gateway (OHLEG) for Ohio Bureau of Motor Vehicle (BMV) records relating to Valentine. The review determined that Valentine possessed a valid Ohio driver's license and reported that he resided at 1261 Jackson Pike, Apartment 15, Gallipolis, Ohio 45631. OHLEG records identified Valentine to have a Beige 2005 Chevrolet Tahoe SUV (VIN 1GNEK13T15R258517) registered to an address at 1261 Jackson Pike, Apartment 15, Gallipolis, Ohio 45631. Further review of publicly available records from the Gallia County OH Auditor, determined 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631 to be the residence of Valentine's mother, Othella L. Close.

17. On or about February 7, 2022, aerial surveillance began at Valentine's residence, 2377 Mount Olive Rd, Bidwell, Ohio 45631, prior to a prearranged controlled narcotics purchase. Law enforcement observed a white truck pull into the driveway of the residence. A person, matching the description of Valentine, was observed exiting the white truck, walking around to the passenger door of the truck and then entering the residence through the right garage door with a bag in his hand. Aerial surveillance observed the white truck was parked in the driveway next to a maroon sedan and a dark colored Jeep Wrangler.



18. On or about the same date, law enforcement met with the government source. The government source advised that he/she was to meet with Valentine in the area of Bidwell, Ohio. The government source was to repay $2,400 cash from the January 24, 2022 transaction that Valentine had "fronted" for an ounce of fentanyl. A controlled audio and video-recorded undercover transaction was arranged between the government source and Valentine. A GPS tracker was affixed to the source's vehicle with his/her consent. The government source and his/her vehicle was searched for contraband with nothing found. The government source contacted Valentine by calling cellular number (740) 339-2592 and arranging to meet for a narcotic purchase. Law enforcement provided the government source with $2,400 in pre-recorded currency, a covert electronic recording device, and established mobile surveillance.

19. After the government source made the call to Valentine, aerial surveillance observed Valentine exit the residence and enter a white Dodge truck. The vehicle had a large white circular-shaped water tank in the bed of the truck. Valentine traveled from his residence to the entrance of a rural driveway, near 43 Scenic Drive, Vinton, Ohio 45686, more specifically GPS Coordinates 38.95065N, 82.3422W. This meeting location was the same location used by Valentine on January 24, 2022.

20. Aerial surveillance observed the government source arrive in his/her vehicle, at the entrance of the rural driveway where Valentine was parked. Valentine exited the white Dodge truck and met with the government source at the driver's window of the government source's vehicle. Valentine stood at the government source's vehicle for several minutes and then reentered the driver's side of the White Dodge truck. The government source left the area.

21. Upon leaving the Scenic Drive location, mobile surveillance units maintained surveillance of the government source. The government source met with law enforcement at a predetermined location. The government source relinquished two ounces of suspected fentanyl and the recording device. The government source and his/her vehicle was searched for contraband with nothing found. The government source advised he/she was to repay Valentine $4,800 in exchange for the two ounces of fentanyl he/she had received. The suspected fentanyl, to include the original packaging, was weighed by law enforcement at 56.68 grams. Law enforcement field-tested the substance, which determined a positive indication for the presence of fentanyl.

22. Immediately following the narcotics transaction and the departure of the

government source vehicle, aerial surveillance observed Valentine driving the white Dodge truck through the gate, up a steep hill, to the end of the driveway, specifically to GPS Coordinates 38.9514N, 82.32603W. This was the same location visited by Valentine following the narcotics transaction on January 24, 2022. At the end of the driveway, Valentine exited the vehicle, walked around to the passenger door, opened the door, and retrieved small items, unable to be identified by aerial surveillance. Valentine then walked to the covered kennel structure and entered. It is unknown what Valentine was doing inside the structure. Valentine also walked to the rear and side of the kennel structure where numerous dogs were observed attached to chains that were secured to the ground. Numerous apparent doghouses could also be observed within the wooded area behind the structure. Aerial surveillance was terminated shortly after Valentine's arrival.

23. Your Affiant reviewed OHLEG for additional Ohio BMV records relating to Valentine. Additional review determined that Valentine has a white 2006 Dodge Truck (VIN 1D7HU18N965633581) registered to him using the address of 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631.

24. Your Affiant reviewed publicly available records from the Gallia County OH Auditor for 43 Scenic Drive, Vinton, OH 45686. The review determined that the property was assigned parcel number 01900169703, consists of 42.771 acres, a residence, outbuildings, agriculture land, and is bordered by Scenic Road to the West, Sprague Road to the East, Summit Road to the North, and parcel number 01900167200 to the South. The property is owned by FREELIN H. WRIGHT (WRIGHT).



25. Your Affiant additionally reviewed publicly available records from the Gallia County OH Auditor, Geographic Information System (GIS) for parcel number 01900169703. Specifically, your Affiant reviewed GIS pictometry dated March 2020. The review determined that the location that Valentine visited on January 24, 2022 and February 7, 2022, was accessed via a long west to east driveway from Scenic Road that is on parcel number 01900169703 and possibly intrudes on parcel number 01900169702. Additionally, the review determined that the kennel structure that houses the dogs and some of the dogs in the wooded area behind the structure possibly intrudes on parcel number 01900169702.



26. Your Affiant also reviewed OHLEG for Ohio BMV records relating to Wright, the owner of parcel number 01900169703. The review determined that Wright possessed a valid Ohio driver's license and reported that he resided at 43 Scenic Road, Vinton, OH 45686. Additional review determined that Wright and Valentine co-own a black 2017 Jeep Wrangler (VIN 1C4BJWFG8HL739267). The Jeep is registered to Valentine at 1261 Jackson Pike, Apartment 15, Gallipolis, OH 45631.

27. Your Affiant reviewed publicly available records from Gallia County OH Auditor for parcel number 01900169702. The review determined that the property consists of 6 acres (1 acre of home site area and 5 acres of woodland), and is bordered by Scenic Road to the West, and parcel number 01900169703 to East, North and South. The property is owned by ROSE E. MCCOY (MCCOY). Review of sales information determined that in 2007, OTHELLA L. CLOSE, the mother of Valentine, sold the property to MCCOY.

28. On February 24, 2022, law enforcement conducted surveillance of the rural driveway entrance associated with parcel number 01900169703. Law enforcement took photographs of the entrance to the rural driveway used by Valentine.

13



29. On or about March 7, 2022, law enforcement began surveillance at Valentine's residence, 2377 Mount Olive Rd, Bidwell, Ohio 45631, prior to a prearranged controlled narcotics purchase. Based on previous search warrants executed for cellular phone ping GPS data (case number 2:22-mj-124), your affiant was able to observe GPS data for the telephone number associated with Valentine, (740) 339-2592. After the government source made contact with Valentine, via a telephone call, GPS Coordinates placed the cellular phone at 38.93687N, -82.32338W, which is associated with the kennel structure location. The next series of GPS Coordinates placed the cellular phone at Valentine's residence, 2377 Mount Olive Rd, Bidwell, Ohio 45631. The next series of GPS Coordinates then placed the cellular phone back at the GPS Coordinates 38.95065N, 82.3422W, where law enforcement observed Valentine to meet with the government source.

30. The government source advised that he/she was to meet with Valentine in the area of Bidwell, Ohio. The government source was to repay $4,800 cash from the February 7, 2022 transaction that Valentine had "fronted" for two ounces of fentanyl. A controlled audio and video-recorded undercover transaction was arranged between the government source and Valentine. The government source and his/her vehicle was searched for contraband with nothing found. The government source contacted Valentine by calling cellular number (740) 339-2592 and arranging to meet for a narcotic purchase. Law enforcement provided the government source with $4,800 in pre-recorded currency, a covert electronic recording device, and established mobile surveillance.

31. After the government source made the call to Valentine, surveillance observed Valentine arrive in a white Dodge truck at the entrance of a rural driveway, near 43 Scenic Drive, Vinton, Ohio 45686, more specifically GPS Coordinates 38.95065N, 82.3422W. This meeting location was the same location used by Valentine on January 24, 2022 and February 7, 2022. Surveillance observed the government source arrive in his/her vehicle, at the entrance of the rural driveway where Valentine was parked. The government source exited his/her vehicle and got into the passenger side of the white Dodge Truck. The government source was in Valentine's vehicle for several minutes and then reentered his/her vehicle. The government source left the area.

32. Upon leaving the Scenic Drive location, mobile surveillance units maintained surveillance of the government source. The government source met with law enforcement at a predetermined location. The government source relinquished two ounces of suspected fentanyl, one ounce of suspected cocaine, and the recording device. The government source and his/her vehicle was searched for contraband with nothing found. The government source advised he/she was to repay Valentine $4,800 in exchange for the two ounces of fentanyl and also $1,100 in exchange for the ounce cocaine he/she had received. The suspected fentanyl, to include the original packaging, was weighed by law enforcement at approximated 57 grams. The suspected cocaine, to include the original packaging, was weighed by law enforcement at 30.85 grams. Law enforcement field-tested the substances, which determined a positive indication for the presence of fentanyl and positive indication for the presence of cocaine.

33. Immediately following the narcotics transaction and the departure of the government source vehicle, surveillance observed Valentine driving the white Dodge truck back

to his residence, 2377 Mount Olive Rd, Bidwell, Ohio 45631. Your affiant reviewed GPS phone ping data associated to Valentine, which returned back to Valentine's residence after the pre-arranged meeting with the government source.

## CONCLUSION

34. Based on the forgoing factual information, your affiant submits there is probable cause to believe that Michael D. Valentine has committed violations of 21 U.S.C. §846 and 21 U.S.C. §841(a) (1), and evidence of those violations is located in the SUBJECT PREMISES. Your affiant respectfully requests that the Court issue a search warrant authorizing the search of the SUBJECT PREMISES as further described in Attachment A and the seizure of the items described in Attachment B.

## REQUEST FOR SEALING

I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

E. Travis Aaron
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this __7th__ day of March, 2022.

Chelsey M. Vascura
United States Magistrate Judge
United States District Court, Southern District of Ohio

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched is located at 2377 Mt. Olive Rd, Bidwell, Ohio 45614 and is a brick home with a red roof and an attached 2 car garage.

This search warrant authorizes the search of the residential premises, curtilage, detached buildings, any vehicles that Michael Valentine owns or has access to, as described in the affidavit in support of the search warrant, which is incorporated herein by reference, and any cellphones located therein or on Michael Valentine:



17